# United States District Court

**EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | | |
|---|---|---|
| IN RE: TOYOTA HYBRID BRAKE LITIGATION | § § § § § § | Consolidated Case No. 4:20-CV-127 Judge Mazzant |

## MEMORANDUM OPINION & ORDER

Pending before the Court is Defendant Toyota Motor Corporation's Motion to Dismiss Pursuant to F.R.C.P. Rule 12(b)(2) (Dkt. #39). Having considered the Motion, the relevant pleadings, and the arguments of counsel, the Court concludes that the Motion should be granted in part and denied in part.

## BACKGROUND

A more thorough background of the case can be found in the Court's October 21, 2020 Memorandum Opinion and Order. *In re Toyota Hybrid Brake Litig.*, 2020 WL 6161495, at *1–4 (E.D. Tex. Oct. 21, 2020). In brief, this action arises out of Plaintiffs' allegations that, along with Toyota Motor Sales, U.S.A., Inc. ("TMS"), Toyota Motor North America, Inc. ("TMNA"), Toyota Engineering & Manufacturing North America, Inc. ("TEMA"), Toyota Motor Corporation ("TMC") did not properly design or manufacture "break booster pump assemblies" for the Class Vehicles, leading the braking systems of these vehicles to fail (Dkt. #28 at p. 8). Defendants contest these allegations.

On July 20, 2020, TMC filed its Motion to Dismiss Pursuant to F.R.C.P. Rule 12(b)(2) (Dkt. #39), currently before the Court. On August 17, 2020, Plaintiffs filed their response (Dkt. #45). On August 31, 2020, TMC filed its reply (Dkt. #49). On September 7, 2020, Plaintiffs filed

their sur-reply (Dkt. #53). And on October 30, 2020, the Court held a hearing on the Motion (*see* Dkt. #59).

## LEGAL STANDARD

"[P]ersonal jurisdiction 'is an essential element of the jurisdiction of a district court, without which . . . court[s are] powerless to proceed to an adjudication.'" *First Inv. Corp. of Marsh. Is. v. Fujian Mawei Shipbuilding, Ltd.*, 703 F.3d 742, 749 (5th Cir. 2012) (original alteration omitted) (quoting *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 584 (1999)). On motion of a nonresident defendant, a case must be dismissed if the court does not have personal jurisdiction over the moving defendant. FED. R. CIV. P. 12(b)(2). When such a motion is filed, the party invoking jurisdiction must "present sufficient facts as to make out only a prima facie case supporting jurisdiction." *Alpine View Co. v. Atlas Copco AB*, 205 F.3d 208, 215 (5th Cir. 2000). "In determining whether that *prima facie* case exists, [courts] 'must accept as true the plaintiff's uncontroverted allegations and resolve in his favor all conflicts between the jurisdictional facts contained in the parties' affidavits and other documentation.'"[1] *Adams v. Unione Mediterranea Di Sicurta*, 364 F.3d 646, 650 (5th Cir. 2004) (original alterations omitted) (quoting *Nuovo Pignone, SpA v. STORMAN ASIA M/V*, 310 F.3d 374, 378 (5th Cir. 2002), *abrogated on other grounds by Water Splash, Inc. v. Menon*, 137 S. Ct. 1504 (2017)).

A federal court sitting in diversity may exercise personal jurisdiction "where the forum state's long-arm statute extends to the nonresident defendant and the exercise of jurisdiction

---

[1] While Plaintiffs must only make out "a *prima facie* case at the Rule 12(b)(2) stage, [their] burden escalates to 'preponderance of the evidence' 'by the end of trial.'" *In re DePuy Orthopaedics, Inc., Pinnacle Hip Implant Prod. Liab. Litig.*, 888 F.3d 753, 778 (5th Cir. 2018) (quoting *Travelers Indem. Co. v. Calvert Fire Ins. Co.*, 798 F.2d 826, 831 (5th Cir. 1986)). Even though this burden subsequently intensifies, determining whether personal jurisdiction exists depends on the facts as they were at the outset of the proceedings. *Harvest Nat. Res., Inc. v. Ramirez Carreno*, No. CV H-18-483, 2020 WL 3063940, at *10 (S.D. Tex. June 9, 2020); *see Mich. Tr. Co. v. Ferry*, 228 U.S. 346, 353 (1913) ("[I]f a judicial proceeding is begun with jurisdiction over the person of the party concerned, it is within the power of a state to bind him by every subsequent order in the cause.").

comports with due process." *Def. Distrib. v. Grewal*, 971 F.3d 485, 490 (5th Cir. 2020); *see Douglass v. Nippon Yusen Kabushiki Kaisha*, 996 F.3d 289, 301 (5th Cir. 2021) (Elrod, J., specially concurring) ("The Supreme Court [has] emphasized that 'principles of interstate federalism' are central to its analysis of Fourteenth Amendment due process limitations on personal jurisdiction." (quoting *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1030 (2021))), *reh'g granted en banc*, 2021 WL 2766866 (5th Cir. July 2, 2021) (mem.). "Service of process" is how federal courts "get[] jurisdiction over [a] person," *Lisak v. Mercantile Bancorp, Inc.*, 834 F.2d 668, 671 (7th Cir. 1987), and courts may exert this power over any nondefendant resident "subject to the jurisdiction of a court of general jurisdiction in the state where the district court is located," FED. R. CIV. P. 4(k)(1)(A).[2] Because "Texas gives its courts of general jurisdiction all of the power allowed by the Due Process Clause," Texas courts need only determine "'whether the exercise of jurisdiction comports with the limits imposed by federal due process on the State of' Texas." *Sayers Constr., L.L.C. v. Timberline Constr., Inc.*, 976 F.3d 570, 573 (5th Cir. 2020) (quoting *Walden v. Fiore*, 571 U.S. 277, 283 (2014)); *see* TEX. CIV. PRAC. & REM. CODE ANN. § 17.042 (Texas long-arm statute).

In the personal-jurisdiction context, "[t]he Due Process Clause protects an individual's liberty interest in not being subject to the binding judgment of a forum with which he has established no meaningful 'contacts, ties, or relations.'" *ITL Int'l, Inc. v. Constenla, S.A.*, 669 F.3d 493, 498 (5th Cir. 2012) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 319 (1945)); *see Ins. Corp. of Ir. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702–03 (1982). "Federal court jurisdiction satisfies Due Process if two conditions are met: '(1) the nonresident must have

---

[2] Here, the laws of Texas govern the analysis. *Bulkley & Assocs., L.L.C. v. Div. of Occupational Safety & Health of Cal.*, ___ F.4th ___, ___, No. 20-40020, 2021 WL 2374295, at *3 (5th Cir. June 10, 2021) ("Personal jurisdiction in federal court is governed by the law of the state in which the federal court sits.").

minimum contacts with the forum state, and (2) subjecting the nonresident to jurisdiction must be consistent with traditional notions of fair play and substantial justice.'" *E. Concrete Materials, Inc. v. ACE Am. Ins. Co.*, 948 F.3d 289, 296 (5th Cir. 2020) (quoting *Freudensprung v. Offshore Tech. Servs., Inc.*, 379 F.3d 327, 343 (5th Cir. 2004)).   There are "two kinds of personal jurisdiction: general (sometimes called all-purpose) jurisdiction and specific (sometimes called case-linked jurisdiction) jurisdiction." *Ford Motor Co.*, 141 S. Ct. at 1024; *see Steinberg v. Int'l Crim. Police Org.*, 672 F.2d 927, 928 (D.C. Cir. 1981) (Ginsburg, J.).   Because general jurisdiction is not at issue, the Court only addresses specific jurisdiction.[3]

Specific jurisdiction exists "when a non-resident defendant 'has purposefully directed its activities at the forum state and the litigation results from alleged injuries that arise out of or relate to those activities.'" *Halliburton Energy Servs., Inc. v. Ironshore Specialty Ins. Co.*, 921 F.3d 522, 539 (5th Cir. 2019) (quoting *Panda Brandywine Corp. v. Potomac Elec. Power Co.*, 253 F.3d 865, 868 (5th Cir. 2001) (per curiam)); *see Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011).   While this precept "can be 'more aspirational than self-defining' in practice," a few principles guide this inquiry. *Power Invs., LLC v. SL EC, LLC*, 927 F.3d 914, 917–18 (6th Cir. 2019) (citation omitted) (quoting *Dudnikov v. Chalk & Vermilion Fine Arts, Inc.*, 514 F.3d 1063, 1071 (10th Cir. 2008) (Gorsuch, J.)).   For instance, specific jurisdiction may exist over a nonresident defendant "whose contacts with the forum state are singular or sporadic[—but] only

---

[3] While TMC addresses general jurisdiction in the Motion (Dkt. #39 at pp. 13–17), in neither the response nor the sur-reply do Plaintiffs contend TMC is subject to the Court's general jurisdiction (*see* Dkts. #45, 53).  Since Plaintiffs effectively concede the absence of general jurisdiction, the Court does not examine it (*see* Dkt. #45 at p. 6).

if the cause of action asserted arises out of or is related to those contacts." *Int'l Energy Ventures Mgmt., L.L.C. v. United Energy Grp., Ltd.*, 818 F.3d 193, 212 (5th Cir. 2016) (emphasis omitted).

To determine whether specific jurisdiction exists, courts engage three separate lines of inquiry:

> (1) whether the defendant has minimum contacts with the forum state, i.e., whether it purposely directed its activities toward the forum state or purposefully availed itself of the privileges of conducting activities there; (2) whether the plaintiff's cause of action arises out of or results from the defendant's forum-related contacts; and (3) whether the exercise of personal jurisdiction is fair and reasonable.

*Seiferth v. Helicopteros Atuneros, Inc.*, 472 F.3d 266, 271 (5th Cir. 2006) (citation omitted). The 12(b)(2) inquiry is "fact intensive and no one element is decisive; rather the touchstone is whether the defendant's conduct shows that it 'reasonably anticipates being haled into court.'" *McFadin v. Gerber*, 587 F.3d 753, 759 (5th Cir. 2009) (quoting *Luv N' Care v. Insta–Mix, Inc.*, 438 F.3d 465, 470 (5th Cir. 2006)); *see Tichenor v. Roman Cath. Church of Archdiocese of New Orleans*, 32 F.3d 953, 958 (5th Cir. 1994) ("This test is the aegis that protects a non-resident defendant's due process rights as guaranteed by the Fourteenth Amendment."). When considering a motion to dismiss for lack of personal jurisdiction, courts consider "the entire record, including the affidavits and documentary evidence filed by the parties." *Stuart v. Spademan*, 772 F.2d 1185, 1192 (5th Cir. 1985).

If the party invoking jurisdiction "establishes the first two prongs, the burden shifts to the [movant] to make a 'compelling case' that the assertion of jurisdiction is not fair or reasonable." *Carmona v. Leo Ship Mgmt., Inc.*, 924 F.3d 190, 193 (5th Cir. 2019). Seldom is an assertion of jurisdiction unfair or unreasonable after a plaintiff demonstrates minimum contacts. *Wien Air Alaska, Inc. v. Brandt*, 195 F.3d 208, 215 (5th Cir. 1999). To evaluate and weigh the "traditional notions of fair play and substantial justice," courts examine: "(1) the burden on the nonresident

defendant; (2) the forum state's interests; (3) the plaintiff's interest in securing relief; (4) the interest of the interstate judicial system in the efficient administration of justice; and (5) the shared interest of the several states in furthering fundamental social policies." *Sangha v. Navig8 ShipManagement Priv. Ltd.*, 882 F.3d 96, 102 (5th Cir. 2018).

## ANALYSIS

Plaintiffs contend that TMC has established sufficient minimum contacts with Texas in three ways:  by (1) conducting business activities through its subsidiaries as its alter egos, (2) conducting business activities in conjunction with its subsidiaries as its agents, and (3) casting itself into the stream of commerce through distribution of Toyota vehicles in the United States (Dkt. #45 at p. 13).  The Court addresses each in turn.

### I.    Minimum Contacts – Alter Ego and Agency

Plaintiffs begin their effort to show personal jurisdiction by focusing on TMC's relationships with its subsidiaries, arguing that the Court has personal jurisdiction over TMC. Specifically, Plaintiffs allege that TMC's subsidiaries are either alter egos or agents of TMC, the parent company (Dkt. #45 at pp. 24–25; Dkt. #53 at pp. 12–13).  By contrast, TMC maintains its distinctiveness from these entities, claiming that neither the alter-ego nor agency theories allow imputation of the subsidiaries' forum contacts to TMC (Dkt. #49 at pp. 15–17).

#### a.  Alter Ego

"It is a general principle of corporate law . . . that a parent corporation . . . is not liable for the acts of its subsidiaries." *United States v. Bestfoods*, 524 U.S. 51, 61 (1998).  Nevertheless, in the personal-jurisdiction context, a subsidiary's forum contacts may be imputed to its parent corporation under certain circumstances. *Jackson v. Tanfoglio Giuseppe, S.R.L.*, 615 F.3d 579, 586 (5th Cir. 2010); *see Minn. Mining & Mfg. Co. v. Eco Chem, Inc.*, 757 F.2d 1256, 1265 (Fed.

Cir. 1985) ("[A] court which has jurisdiction over a corporation has jurisdiction over its alter egos."). Such is the case when companies are considered to be one and the same, at which point "the jurisdictional contacts of one are the jurisdictional contacts of the other for the purposes of . . . due process analysis." *Patin v. Thoroughbred Power Boats Inc.*, 294 F.3d 640, 653 (5th Cir. 2002).

> To determine whether an alter-ego relationship exists, courts examine whether:
>
> (1) distinct and adequately capitalized financial units are incorporated and maintained; (2) daily operations of the two corporations are separate; (3) formal barriers between management of the two entities are erected, with each functioning in its own best interests; and (4) those with whom the corporations come in contact are apprised of their separate identity. Other factors deemed important . . . are: (1) common stock ownership; (2) the method and degree of financing of the subsidiary by the parent; (3) common directors or officers; (4) separate books and accounts; (5) common business departments; (6) extent to which contracts between parent and subsidiary favor one over the other; and (7) connection of parent's employee, officer or director to subsidiary's tort or contract giving rise to suit.

*Miles v. Am. Tel. & Tel. Co.*, 703 F.2d 193, 195 (5th Cir. 1983). No single factor in this analysis is dispositive. *Fundamental Innovation Sys. Int'l, LLC v. ZTE Corp.*, No. 3:17-CV-01827-N, 2018 WL 3330022, at *3 (N.D. Tex. Mar. 16, 2018). "Alter ego determinations are highly fact-based, and require considering the totality of the circumstances in which the instrumentality functions." *Bridas S.A.P.I.C. v. Gov't of Turkm.*, 345 F.3d 347, 359 (5th Cir. 2003). Courts do, however, apply a less demanding standard when analyzing alter-ego status in a 12(b)(2) motion than when evaluating liability.[4] *Spademan*, 772 F.2d at 1198 n.12. And while the party asserting jurisdiction need only make a prima facie showing at this stage, *Garcia v. Peterson*, 319 F. Supp. 3d 863, 882 (S.D. Tex. 2018), it must still demonstrate that "a parent corporation exercised control and dominion over a subsidiary to such a degree that . . . it would be inequitable to continue to

---

[4] Plaintiffs noted that TMC appears to invert this standard throughout its arguments. Motion Hearing, 10:30:43–31:15, Oct. 30, 2020 [hereinafter *Hearing*].

recognize the fiction of separate corporate identities," *Jaffer v. Standard Chartered Bank*, 301 F.R.D. 256, 262 (N.D. Tex. 2014).

TMC argues that Plaintiffs have not proven that TMNA, TMS, or TEMA function as an alter ego of TMC. Specifically, TMC offers that the four companies are "separate corporations," "each observ[ing] all corporate formalities necessary for [their] separate legal existence[s]" (Dkt. #39 at p. 10). These entities maintain their own respective "employees, facilities, accounting systems, records, and further maintain separate operations and departments" (Dkt. #39 at p. 10). And even though TMC owns stock in TMNA, "TMNA, as well as TMS and TEMA, maintain their own board of directors[] and manage their own employees" (Dkt. #39 at p. 16). As such, TMC argues that Plaintiffs have "fallen far short" of meeting the standard necessary to impute jurisdictional contacts under the alter-ego theory (Dkt. #49 at p. 16). Plaintiffs see things differently, highlighting three facts they believe evince the Court's power to exercise personal jurisdiction under this theory: (1) TMC is responsible for the "overall design, development, and distribution" of the vehicles at issue in this litigation; (2) TMC owns all of TMNA's stock; and (3) TMC, TMNA, TMS, and TEMA "share common marketing images, trademarks, and logos, with each entity often simply presenting itself as 'Toyota'"[5] (Dkt. #53 at p. 12).

Plaintiffs have not offered sufficient evidence that TMNA, TMS, or TEMA is an alter ego of TMC. To satisfy this standard, Plaintiffs needed to prove that the relationship between TMC and any one of these other entities is so all-consuming as to constitute complete domination by TMC. *Hanson Pipe & Prods., Inc. v. Bridge Techs., LLC*, 351 F. Supp. 2d 603, 612 (E.D. Tex. 2004), *aff'd*, 160 F. App'x 380 (5th Cir. 2005); *see, e.g.*, *Graduate Med. Educ. Dev., LLC v. St. George's Univ., Ltd.*, No. CV H-15-2641, 2016 WL 5844707, at *6–8 (S.D. Tex. Oct. 6, 2016).

---

[5] In their response, Plaintiffs purport to advance the alter-ego theory, but the substance in that section only concerns agency theory (*see* Dkt. #45 at pp. 24–26).

When considering the facts Plaintiffs present, the evidence is inadequate to show that TMC dominates TMNA, TMS, or TEMA to the extent that these companies have, "for practical purposes, surrendered [their] corporate identit[ies]." *Gardemal v. Westin Hotel Co.*, 186 F.3d 588, 594 (5th Cir. 1999); *see Hargrave v. Fibreboard Corp.*, 710 F.2d 1154, 1160 (5th Cir. 1983) ("[1]00% stock ownership and commonality of officers and directors are not alone sufficient to establish an alter ego relationship between two corporations. Generally, our cases demand proof of control by the parent over the internal business operations and affairs of the subsidiary in order to fuse the two for jurisdictional purposes. The degree of control exercised by the parent must be greater than that normally associated with common ownership and directorship." (citations omitted)). The reality is "just the opposite"—TMNA, TMS, and TEMA "function[] as autonomous business entit[ies]." *Gardemal*, 186 F.3d at 594. This being the case, none of these companies can be considered an alter ego of TMC.

### b. Agency

Minimum contacts can also be imputed from one entity to another if an agency relationship exists between them. *Maxum Enters., LLC v. Auto. Fleet Enters., Inc.*, No. 3:18-CV-0687-B, 2018 WL 3417234, at *3 (N.D. Tex. July 13, 2018). For an agency relationship to allow for imputation of contacts, "the 'evidence must establish that the principal has both the right: (1) to assign the agent's task; and (2) to control the means and details of the process by which the agent will accomplish that task.'" *Trois v. Apple Tree Auction Ctr., Inc.*, 882 F.3d 485, 490 (5th Cir. 2018) (emphasis omitted) (quoting *Indian Harbor Ins. Co. v. Valley Forge Ins. Grp.*, 535 F.3d 359, 364 (5th Cir. 2008)). To succeed under this theory, the party invoking jurisdiction must show that the entity acted as the principal's agent "at the time of the relevant conduct." *Embarcadero Techs., Inc. v. Redgate Software, Inc.*, No. 1:17-CV-444-RP, 2018 WL 315753, at *7 (W.D. Tex. Jan. 5,

2018). "An agency relationship must be affirmatively established and not presumed." *Horton v. Sunpath, Ltd.*, No. 3:20-CV-1884-B-BH, 2021 WL 982344, at *4 (N.D. Tex. Feb. 16, 2021), *report and recommendation adopted*, 2021 WL 977065 (N.D. Tex. Mar. 15, 2021).

To demonstrate an agency relationship among TMC and the other companies, Plaintiffs advance Toyota's distribution network and the downstream positions of TMNA, TMS, and TEMA as proof that necessitates the imputation of the subsidiaries' jurisdictional contacts (Dkt. # 45 at pp. 24–25). Plaintiffs also stress TMC's "direction and supervision" over TMNA, TMS, and TEMA as evidence of agency relationships (Dkt. #45 at pp. 8, 10). Additionally, Plaintiffs request the Court consider the extent to which "TMC's domestic subsidiaries perform functions in the U.S. that TMC would otherwise have conducted itself, namely, the marketing and promotion of all Toyota vehicles" (Dkt. #53 at p. 13). TMC responds that Plaintiffs' arguments are not enough (Dkt. #39 at pp. 7, 14, 20; Dkt. #49 at pp. 16–17). In particular, TMC argues that, "in the absence of evidence that TMC itself engaged in relevant acts in Texas . . . , Plaintiffs cannot establish specific jurisdiction over TMC through its relationship with the other Toyota Defendants" (Dkt. #39 at p. 17).

Plaintiffs have offered insufficient evidence to prove that TMNA, TMS, or TEMA is TMC's agent. TMC assuredly has a close business relationship with the other defendants, but an agency relationship is not evident from the record. Plaintiffs offer no proof that TMC "assign[s] tasks and control[s] the means and details of the process by which [TMNA, TMS, or TEMA] conducts [their] business." *Horton*, 2021 WL 982344, at *4. Absent affirmative proof of an agency relationship between TMC and these other three companies, no such connection exists, which means the contacts of TMNA, TMS, and TEMA cannot be imputed to TMC for jurisdictional purposes under the agency theory. *See, e.g., Doe v. Compact Info. Sys., Inc.*, No.

3:13-CV-5013-M, 2015 WL 5437702, at *6 (N.D. Tex. Aug. 25, 2015), *report and recommendation adopted*, 2015 WL 5439037 (N.D. Tex. Sept. 15, 2015); *Havel v. Honda Motor Europe Ltd.*, No. H-1291, 2014 WL 4967229, at *15 (S.D. Tex. Sept. 30, 2014).

## II. Minimum Contacts – Stream of Commerce

Without the alter-ego or agency theories, Plaintiffs must demonstrate the Court's jurisdiction over TMC through the stream-of-commerce theory of specific jurisdiction. This approach typically involves "a nonresident defendant, acting *outside* the forum, plac[ing] in the stream of commerce a product that ultimately causes harm *inside* the forum." *Goodyear*, 564 U.S. at 926; *see Williams v. Romarm, SA*, 756 F.3d 777, 784 (D.C. Cir. 2014) ("Personal jurisdiction can also be premised on a defendant's participation in the 'stream of commerce,' which 'refers to the movement of goods from manufacturers through distributors to consumers.'" (quoting *J. McIntyre Mach., Ltd. v. Nicastro*, 564 U.S. 873, 881 (2011) (plurality opinion))).

Plaintiffs assert that, through its corporate structure, TMC "design[s], manufacture[s], assemble[s], and developmentally test[s]" the Class Vehicles and then, "[r]egardless of where the vehicle is manufactured," places these vehicles into the stream of commerce "through TMS's network of dealers" (Dkt. #45 at p. 10). Because "TMC expected the Class Vehicles to be purchased by or used by consumers" in Texas, Plaintiffs assert that TMC has established sufficient minimum contacts under the stream-of-commerce theory (Dkt. #53 at p. 9). TMC disagrees, arguing that Plaintiffs' allegations are insufficient under the stream-of-commerce principle because "Plaintiffs have not alleged facts or presented proof demonstrating TMC designed its

vehicles for uses specific to the state of Texas, that the market for automobiles in Texas is unique, or that TMC had specific knowledge of sales in Texas" (Dkt. #49 at p. 11).

When courts in the Fifth Circuit apply the stream-of-commerce theory, the minimum-contacts prong is satisfied "so long as the court 'finds that the defendant delivered the product into the stream of commerce with the expectation that it would be purchased by or used by consumers in the forum state.'" *Ainsworth v. Moffett Eng'g, Ltd.*, 716 F.3d 174, 177 (5th Cir. 2013) (quoting *Bearry v. Beech Aircraft Corp.*, 818 F.2d 370, 374 (5th Cir. 1987)).

> Under th[is] test, "mere foreseeability or awareness is a constitutionally sufficient basis for personal jurisdiction if the defendant's product made its way into the forum state while still in the stream of commerce," but "the defendant's contacts must be more than random, fortuitous, or attenuated, or of the unilateral activity of another party or third person."

*Id.* (original alterations and footnote omitted) (first quoting *Luv N' Care*, 438 F.3d at 470; and then quoting *ITL Int'l*, 669 F.3d at 498).[6]

The Court begins by considering the two facets of minimum contacts, purposeful availment and relatedness, addressing each in turn.

### a. Purposeful Availment

Looking first at purposeful availment, the Court views the facts underlying the Motion to be essentially uncontested. Accordingly, after examining the record, the Court finds TMC to have

---

[6] Despite multiple attempts to clarify stream-of-commerce precedent, the Supreme Court has not provided a majority view on the subject since *World-Wide Volkswagen*. *See Cincinatti Ins. Co. v. Samsung SDI Co. Ltd.*, No. 5:17-CV-1688-LCB, 2020 WL 1536592, at *7 (N.D. Ala. Mar. 31, 2020). Following the Supreme Court's decisions in both *Asahi* and *McIntyre*, the Fifth Circuit held that its stream-of-commerce framework remained unchanged. *See Irving v. Owens-Corning Fiberglas Corp.*, 864 F.2d 383, 386 (5th Cir. 1989) ("Because the Court's splintered view of minimum contacts in *Asahi* provides no clear guidance on this issue, we continue to gauge [a defendant's] contacts with [the forum state] by the stream of commerce standard as described in *World-Wide Volkswagen* and embraced in this circuit."); *In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, 753 F.3d 521, 541 (5th Cir. 2014) ("[T]he law remains the same after *McIntyre* . . . ."). As such, the standard announced in *World-Wide Volkswagen* controls here.

The Court further notes that, contrary to TMC's contention, the Supreme Court's decision in *Bristol-Myers Squibb Co. v. Superior Court of California* (*BMS*), 137 S. Ct. 1773 (2017), did not alter the current stream-of-commerce framework, as the opinion "makes absolutely no mention of either Justice Brennan or Justice O'Connor's theories under the stream of commerce doctrine." *Lindsley v. Am. Honda Motor Co., Inc.*, No. CV 16-941, 2017 WL 3217140, at *2 (E.D. Pa. July 28, 2017); *see DePuy*, 888 F.3d at 777–81 (applying the same stream-of-commerce principle after

purposefully availed itself of Texas as a forum.[7]  TMC manufactures vehicles, including the Class

Vehicles (Dkt. #45 at p. 8).  TMC is also responsible for "the overall design and development

testing of certain U.S. bound vehicles"[8] (Dkt. #45 at p. 9).  In other words, through its corporate

structure, TMC "design[s], manufacture[s], assemble[s], and developmentally test[s]" the Class

Vehicles (Dkt. #45 at p. 10).  Then TMC, acting in concert with its network of distributors, either

moves these already-assembled vehicles to the United States or has them assembled stateside, after

which this network propels the vehicles downstream for sale across the United States, including

Texas (Dkt. #39 at p. 9 n.2; Dkt. #45 at p. 10).  Furthermore, the interconnected corporate structure

of the four defendants—with TMC at the head—bases its domestic operations in Texas (*see* Dkt.

#45 at pp. 10–11; *Hearing, supra*, 10:02:48–10:03:28).  Under personal-jurisdiction precedent,

these connections to Texas as the forum state are readily apparent and, taken on the whole, are

certainly sufficient to satisfy the purposeful-availment requirement under the stream-of-commerce

theory.  *See Frito-Lay N. Am., Inc. v. Medallion Foods, Inc.*, 867 F. Supp. 2d 859, 867–68 (E.D.

Tex. 2012).

TMC views things differently, offering two general reasons why the application of these

facts to established law does not show purposeful availment.  First, TMC argues that its contacts

with third parties, *i.e.*, TMS, TMNA, and TEMA, cannot factor into the purposeful-availment

calculus as to TMC.  Second, TMC asserts that the facts Plaintiffs allege and rely upon are wholly

---

BMS); *see also, e.g.*, *Semcon IP Inc. v. TCT Mobile Int'l Ltd.*, No. 2:18-CV-00194-JRG, 2019 WL 2774362, at *2–3
(E.D. Tex. July 2, 2019); *Slyce Acquisition Inc. v. Syte - Visual Conception Ltd.*, 422 F. Supp. 3d 1191, 1201 (W.D.
Tex. 2019); *LLOG Expl. Co., L.L.C. v. Fed. Flange, Inc.*, No. CV 17-2323, 2019 WL 4038599, at *5–6 (E.D. La. Aug.
27, 2019).

[7] TMC requests that the Court disregard any mention of an aggregated "Toyota" defendant that consists of the four
separate defendants in the action (*see* Dkt. #39 at p. 19; Dkt. #49 at p. 12).  TMC's position is a correct statement of
law, and the Court accordingly analyzes specific jurisdiction through a disaggregated lens.  *See, e.g.*, *Diece-Lisa
Indus., Inc. v. Disney Enters., Inc.*, 943 F.3d 239, 251–52 (5th Cir. 2019).

[8] TMC does not contest that it designs, develops, and manufactures the Class Vehicles.  *Hearing, supra*, 9:48:03–:22.

insufficient to demonstrate purposeful availment for the stream-of-commerce analysis. The Court breaks down each argument in turn, ultimately finding them unpersuasive.

TMC's first contention pertains to its commercial relations with its American subsidiaries; TMC argues that merely distributing the vehicles at issue into the stream of commerce "through a distributor located in the forum state is not sufficient to establish specific jurisdiction" (Dkt. #39 at p. 20). To start, the proposition TMC offers does not correctly state the law. Writing for the unanimous *Walden* Court, Justice Thomas made clear that "a defendant's contacts with the forum State may be intertwined with his transactions or interactions with the plaintiff *or other parties*." 571 U.S. at 286 (emphasis added).

More to the point, TMC's position is an unduly narrow reading of relevant caselaw. The reality is this: finding specific jurisdiction under the stream-of-commerce theory may very well be appropriate when a third party is involved in, but not directly responsible for, a product's arrival in a particular forum. *Dillard v. Fed. Corp.*, 321 F. Supp. 3d 752, 758–59 (W.D. Tex. 2018); *see J.S.T. Corp. v. Foxconn Interconnect Tech. Ltd.*, 965 F.3d 571, 576 (7th Cir. 2020) (Barrett, J.) ("The stream of commerce theory contemplates that a defendant's product may go through middlemen before reaching consumers . . . ."). Utilizing a distribution network involving distinct legal entities does not, by default, immunize TMC from the Court's reach. *See, e.g.*, *Coulter v. Sears, Roebuck & Co.*, 426 F.2d 1315, 1317–18 (5th Cir. 1970). Fifth Circuit law makes clear that placing one or more degrees of separation from the customer does not foreclose the possibility of purposeful availment under the stream-of-commerce analysis. *See ITL Int'l*, 669 F.3d at 498.

Attempting to circumvent this principle, TMC relies on the formalities of corporate structure and transactions to insist that it has not purposefully availed itself of Texas as a forum (*see, e.g.*, Dkt. #49 at p. 10 ("TMC does not sell its vehicles directly to consumers in Texas")).

TMC primarily argues that "using a subsidiary with ties to Texas to act on its behalf" does not mean it has purposefully availed itself of Texas (Dkt. #39 at p. 21). For example, TMC avers that the vehicles "manufactured in Japan and sold in the United States are imported primarily by [TMS]" (Dkt. #39, Exhibit 1 at p. 2). The problem with this argument is that "jurisdiction does not depend on the technicalities of when title passes."[9] *Oswalt v. Scripto, Inc.*, 616 F.2d 191, 197 n.8 (5th Cir. 1980). TMC's proffered approach is overly rigid and formulaic—the "analysis [must be] more 'realistic' than 'mechanical,' turning on matters of 'substance' rather than 'form.'" *DePuy*, 888 F.3d at 779 (footnotes omitted).

Under Fifth Circuit law, "jurisdiction may attach both to manufacturers who supply their own delivery systems and to those that make use of the distribution systems of third parties." *Luv N' Care*, 438 F.3d at 471; *cf. McMillan, v. Amazon.com, Inc.*, ___ F.4th ___, ___, No. 20-20108, 2021 WL 2660209, at *1 (5th Cir. June 29, 2021). It is analytically irrelevant that TMC first sells the vehicles to its American distribution network, which is then followed by the downstream entities (that comprise the network) selling those vehicles to domestic consumers. *See, e.g.*, *In re Norplant Contraceptive Prods. Liab. Litig.*, 886 F. Supp. 586, 591 (E.D. Tex. 1995); *Rodriguez Leal v. Monaco Coach Corp.*, No. CV M-10-25, 2011 WL 13350729, at *5 (S.D. Tex. Feb. 15, 2011); *see also Eddy v. Printers House (P) Ltd.*, 627 F. App'x 323, 327 (5th Cir. 2015) (finding a product remains in the stream of commerce until "a consumer of the product, not a distributor or retailer," possesses it); *Eyerly Aircraft Co. v. Killian*, 414 F.2d 591, 597 (5th Cir. 1969) ("[The manufacturer] did not intend for its products to be sedentary and it had reason to know that [they]

---

[9] Plus, in this instance, stating that TMS imports vehicles into the United States is the same as stating that TMC exports vehicles to the United States. *See Fla. Sugar Mktg. & Terminal Ass'n, Inc. v. United States*, 220 F.3d 1331, 1337 (Fed. Cir. 2000) ("[I]mports and exports are two sides of the same coin."); *see also Woodruff v. Parham*, 75 U.S. (8 Wall.) 123, 131–32 (1868); *Swan & Finch Co. v. United States*, 37 Ct. Cl. 101, 104–05 (1901), *aff'd*, 190 U.S. 143 (1903).

would not come to a permanent rest at the domicile of its original purchaser.").  This sequence of events constitutes purposeful availment of Texas as a forum via the stream of commerce, especially given TMC's parental relation to the distribution network.[10]  *See Bean Dredging Corp. v. Dredge Tech. Corp.*, 744 F.2d 1081, 1085 (5th Cir. 1984) ("[E]ven though [the component-part manufacturer] 'did not originate the distribution system and does not control it, the company did place [its products] in and move them along a stream of commerce destined for retail sale." (original alterations omitted) (quoting *Nelson by Carson v. Park Indus., Inc.*, 717 F.2d 1120, 1126 (7th Cir. 1983))); *see also McFadin*, 587 F.3d at 763 (explaining that "supply[ing] the goods that were ultimately sold" suggests purposeful availment).  Furthermore, "[i]n a broader sense, [TMC] should not be permitted to escape personal jurisdiction by intertwining itself in a multi-layered contractual arrangement."  *Nuovo Pignone*, 310 F.3d at 380; *see, e.g.*, *C&F Int'l, Inc. v. Abu Dhabi Metal Pipes & Profiles Indus. Complex LLC*, No. 4:15-CV-03350, 2019 WL 4954605, at *5 (S.D. Tex. Mar. 27, 2019).  TMC's position regarding its third-party contacts is, therefore, untenable.  *See Bangor Punta Operations, Inc. v. Universal Marine Co., Ltd.*, 543 F.2d 1107, 1110 n.5 (5th Cir. 1976).

More generally, TMC contests that Plaintiffs' factual assertions are enough to demonstrate purposeful availment (*see* Dkt. #39 at pp. 8–10; Dkt. #49 at pp. 8–15).  TMC's primary complaint on this front appears to be that Plaintiffs must offer something more than "an allegation that the foreign manufacturer should know its vehicles will end up in Texas because it designs, manufactures and tests vehicles that are sold in the United States" (Dkt. #49 at p. 9).  Further, TMC

---

[10] Say, for instance, a consumer were to peruse TMS's state-by-state, online catalog of authorized dealers.  *See Locate a Toyota Car Dealership in Your State*, Toyota Motor Sales, U.S.A., Inc., https://www.toyota.com/dealers/directory/ [https://perma.cc/6YLS-NA2A].  If the consumer then decided to select the "Learn More" option regarding Toyota dealers outside the United States, the consumer would be rerouted directly to TMC's website.  *See* Toyota Motor Corp., https://global.toyota/en/ [https://perma.cc/ZEW5-RCRU].  The Court highlights this example to show that, while corporate formalities may remain intact, TMC's argument regarding the irrelevancy of contacts with its American subsidiaries is not as strong as TMC purports.

argues that a multitude of facts highlighted in the Motion and its reply demonstrate why TMC has not purposefully availed itself of Texas as a forum (*see* Dkt. #39 at p. 21; Dkt. #49 at pp. 11–14). Despite insistence to the contrary, TMC's argument is unconvincing.

To start, the purposeful-availment inquiry in the stream-of-commerce context is fact-intensive and case-specific. *Zoch v. Magna Seating (Ger.) GmbH*, 810 F. App'x 285, 293 (5th Cir. 2020) ("Specific jurisdiction should be determined on a case-by-case basis under the facts of each individual case."); *N. Tex. Opportunity Fund L.P. v. Hammerman & Gainer Int'l, Inc.*, 107 F. Supp. 3d 620, 628 (N.D. Tex. 2015) ("Whether a party's conduct creates sufficient minimum contacts to a forum State is highly fact-dependent."). As well, the stream-of-commerce subspecies of specific jurisdiction is far-reaching, encompassing myriad iterations of transactional arrangements and commercial activities. *See Tanfoglio*, 615 F.3d at 585. Because the analysis in these instances is so fact-dependent, one case simply resembling another is not enough for specific factual scenarios to preclude a finding of specific jurisdiction. Courts must take the facts of each case and consider them anew against established personal-jurisdiction precedent. This is all to say that, contrary to TMC's urging, specific jurisdiction may be found in a variety of cases involving

the stream of commerce that contain never-before-encountered fact patterns. As such, the Court continues to conduct its review of these unique facts for specific jurisdiction.

In its view, TMC believes the relevant facts are insufficient for the Court to exercise specific jurisdiction over it. TMC lists the following to justify this position:

- "TMC does not design or manufacture Toyota vehicles in Texas" (Dkt. #39 at p. 21)
- "TMC does not ship vehicles for the purpose of sale directly into the State of Texas and it does not advertise or market here" (Dkt. #39 at p. 21)
- TMC "does not do business in Texas and is not licensed to do so" (Dkt. #39 at p. 21)
- TMC "has no agent for service of process for civil proceedings in Texas, does not own or lease real estate here, and has no place of business here" (Dkt. #39 at p. 21)
- TMC does not design "its vehicles for uses specific to the state of Texas" (Dkt. #49 at p. 11)
- The "market for automobiles in Texas" is not "unique" (Dkt. #49 at p. 11)
- TMC does not "ha[ve] specific knowledge of sales in Texas (Dkt. #49 at p. 11)
- Allegations of TMC's "long-standing and material knowledge" of the defect at issue is analytically irrelevant (Dkt. #49 at p. 13 & n.4)

Here again, TMC advances a procrustean and overly formalistic approach to the stream-of-commerce doctrine. *See Conrad Shipyard, L.L.C. v. Franco Marine 1 LLC*, 431 F. Supp. 3d 839, 852 (E.D. La. 2020) ("The crux of a specific jurisdiction analysis is the defendant's actual conduct, not legal technicalities . . . ."). Bits and pieces of these facts are certainly aspects the Court should consider. But the vast majority are simply not pertinent to the applicable analysis.[11]

The touchstone of the stream-of-commerce inquiry is foreseeability. *Ainsworth*, 716 F.3d at 174; *see Chung v. NANA Dev. Corp.*, 783 F.2d 1124, 1127 (4th Cir. 1986) ("The focus on a defendant's own acts serves the underlying due process objective of fair notice . . . ."). While the parameters of foreseeability in the stream-of-commerce context are less than exact, certain

---

[11] In fact, several of these assertions are only relevant to Justice O'Connor's "stream-of-commerce-plus" test from *Asahi*, which is not the applicable standard in this circuit. *BHL Boresight, Inc. v. Geo-Steering Sols., Inc.*, No. 4:15-CV-00627, 2017 WL 2730739, at *5 (S.D. Tex. June 26, 2017); *see Asahi Metal Indus. Co., Ltd. v. Sup. Ct. of Cal.*, 480 U.S. 102, 112 (1987) (plurality op.) (listing these additional considerations).

guideposts direct courts in such inquiries. The Court examines three here: role in the stream of commerce, economic value derived from the product's placement in the stream of commerce, and geographic limitations imposed on the product's movement in the stream of commerce.

Turning first to a defendant's role in placing a product within the stream of commerce, precedent makes clear that rotely labeling one's role is not determinative for stream-of-commerce purposes—the actions a defendant takes, however, are. *See DePuy*, 888 F.3d at 779 ("Personal jurisdiction does not turn on labels or relative connection to the forum." (emphasis omitted)). This principle is logical: the greater the scope of a defendant's involvement in placing and moving a product in the stream of commerce, the more reasonable it is for a defendant to anticipate being haled into federal court within a particular forum. *See Luv N' Care*, 438 F.3d at 470 ("Where a defendant knowingly benefits from the availability of a particular state's market for its products, it is only fitting that the defendant be amenable to suit in that state."); *see also UMG Recordings, Inc. v. Kurbanov*, 963 F.3d 344, 352 (4th Cir. 2020) ("Relevant to this analysis are the quality and nature of the defendant's connections . . . ."). Quoting directly from a Seventh Circuit opinion, the Fifth Circuit explained why this is the case:

> The *World-Wide Volkswagen* Court's recognition of a distinction among the various entities that might compose a distribution system of a product is pivotal to the decision in this case. The scope of the foreseeable market served by those defendants and of the benefits those defendants derived from the sale of the product was narrow. In contrast, the relevant scope is generally broader with respect to manufacturers and primary distributors of products who are at the start of a distribution system and who thereby serve, directly or indirectly, and derive economic benefit from a wider market. Such manufacturers and distributors purposely conduct their activities to make their product available for purchase in as many forums as possible. For this reason, a manufacturer or primary distributor may be subject to a particular forum's jurisdiction when a secondary distributor and

retailer are not, because the manufacturer and primary distributor have intended to serve a broader market and they derive direct benefits from serving that market.

*Bean Dredging*, 744 F.2d at 1084 (ellipsis and internal quotation marks omitted) (quoting *Nelson by Carson*, 717 F.2d at 1125–26). The Fifth Circuit has even gone as far as finding that a "nonmanufacturing parent" company, shielded by the corporate veil, may well have sufficient contacts with a forum to fall within the stream of commerce. *See DePuy*, 888 F.3d at 779. As explained above, *supra* pp. 14–16, the scope of TMC's involvement here is more like that of a manufacturer or primary distributor—as such, TMC's role as to the immediate action makes it reasonably foreseeable that TMC could be haled into a Texas court.

Second, the economic value a defendant derives from a product's placement in the stream of commerce factors into the purposeful-availment analysis. Financial benefit has been one of the key considerations in Fifth Circuit stream-of-commerce cases for quite some time. *E.g.*, *Owens-Corning*, 864 F.2d at 387. Considering pecuniary benefit in this setting makes sense—as the Fifth Circuit articulated in *Choice Healthcare, Inc. v. Kaiser Foundation Health Plan of Colorado*, "Deriving revenue from . . . commercial activity is the quid pro quo for requiring [a] defendant to suffer a suit in the foreign forum." 615 F.3d 364, 373 (5th Cir. 2010). In this case, the actions TMC took made it a "voluntary member of the economic chain" that brought the product stateside, including to Texas; as a result, TMC purposefully "availed itself of the privilege of conducting business in" Texas. *Nuovo Pignone*, 310 F.3d at 380. This conclusion naturally follows from the undisputed facts presented to the Court, as well as Plaintiffs' allegation that "[m]oney received by . . . dealer[s] . . . can be traced to TMS and TMC"[12] (Dkt. #28 at p. 31; *see* Dkt. #45 at p. 10).

---

[12] TMC consistently refers to Plaintiffs' allegations as "conclusory," arguing that they are insufficient to support a finding of personal jurisdiction (*see* Dkt. #39 at pp. 19–20; Dkt. #49 at p. 13 n.4). The Court is unconvinced the allegations with which TMC takes issue are actually conclusory. *See FTC v. Educare Centre Servs., Inc.*, 414 F. Supp. 3d 960, 975–78 (W.D. Tex. 2019) (reviewing examples of conclusory and nonconclusory allegations). Furthermore,

Furthermore, TMC's economic connection to the stream of commerce is far from "tenuous," as TMC is explicitly involved in the design, testing, and manufacture of the Class Vehicles—activities directly related to the generation of considerable revenue (and implicitly related to a lawsuit concerning an allegedly defective product). *See McFadin*, 587 F.3d at 763. In sum, the manner in and extent to which TMC benefits financially here makes it reasonably foreseeable that TMC could be haled into court in Texas.

Third, when examining the purposeful-availment prong in this context, courts consider the geographic limitations a defendant imposes on a product's movement within the stream of commerce. This aspect matters because defendants are able to "structure their primary conduct" to control where they may be amenable to suit. *World-Wide Volkswagen v. Woodson*, 444 U.S. 286, 297 (1980); *see Prejean v. Sonatrach, Inc.*, 652 F.2d 1260, 1269 n.17 (5th Cir. Unit A Aug. 1981) ("[Stream-of-commerce] cases distinguish between purposeful introduction of products into commerce generally or a national distribution system, on the one hand, and patterning the distribution scheme to avoid having the products reach a particular jurisdiction, on the other. When some products in the latter case nonetheless reach that state through unexpected or fortuitous circumstances, jurisdiction on that contact is impermissible."). If a defendant brings its product to market en masse "in an attempt to reach as broad a market as possible" and makes "no effort to limit the states" in which the product will be sold, the likelihood that a court will find the defendant to have purposefully availed itself of the forum in question increases significantly. *Vault Corp. v. Quaid Software Ltd.*, 775 F.2d 638, 640 (5th Cir. 1985). In this situation, TMC could have "'structure[d] its primary conduct' to lessen or avoid exposure to [Texas's] courts"—but it did not. *Ford Motor Co.*, 141 S. Ct. at 1025 (original alterations omitted) (quoting *World-Wide*

---

courts must resolve all controverted allegations in the plaintiff's favor when only a prima facie case of personal jurisdiction must be made. *Def. Distrib.*, 971 F.3d at 490.

*Volkswagen*, 444 U.S. at 297). Therefore, TMC could reasonably anticipate that its geographically unlimited product flow would reach, among other states, Texas—one of the largest and most consumer-heavy states in the country—thereby subjecting TMC to the jurisdiction of Texas courts.

Finally, evaluating the facts presented with general considerations of foreseeability makes even clearer why TMC has purposefully availed itself of Texas as a forum. Foreseeability has been the core of the Fifth Circuit's stream-of-commerce analysis for the last half-century. *See Charia v. Cigarette Racing Team, Inc.*, 583 F.2d 184, 188–89 (5th Cir. 1978); *Gold Kist, Inc. v. Baskin-Robbins Ice Cream Co.*, 623 F.2d 375, 382 & n.5 (5th Cir. 1980); *Ruston Gas Turbines, Inc. v. Donaldson Co., Inc.*, 9 F.3d 415, 419 (5th Cir. 1993); *Jackson v. FIE Corp.*, 302 F.3d 515, 530 (5th Cir. 2002); *Pervasive Software Inc. v. Lexware GmbH & Co. KG*, 688 F.3d 214, 228 (5th Cir. 2012); *Zoch*, 810 F. App'x at 290. Accompanying this established standard is the long-held understanding that there is "no distinction between whether a defendant knew or should have known that its product would reach a particular state." *VP Racing Fuels, Inc. v. Dri-Stick Decal Corp.*, No. SA-04-CA-0551-RF, 2005 WL 1168430, at *4 (W.D. Tex. May 18, 2005). As the Fifth Circuit has previously explained,

> The traditional equivalence between "know" and "should have known" in our jurisprudence suggests that . . . it is a distinction that makes no difference. . . . [It] cannot [be] sa[id] that a potential defendant who actually knows his products will ultimately reach the forum state any more "purposefully avails itself of the privilege of conducting activities (there)," than a potential defendant who merely should have known.

*Oswalt*, 616 F.2d at 200–01 (citation omitted) (quoting *Hanson v. Denckla*, 357 U.S. 235, 253 (1958)). Given the facts as recounted by the Court, *supra* pp. 12–13, it should be unsurprising to TMC that it has purposefully availed itself of Texas's forum. TMC designs, tests, and manufactures the vehicles at issue and disperses them through a self-designed distribution network. The downstream entities in this TMC-led distribution network are based here in Texas and function

in lockstep with TMC. Given the relevant facts in the record, TMC claiming an inability to foresee being haled before the Court as a defendant to this suit strains credulity.

Simply put, given its volitional actions that placed the Class Vehicles in Texas, TMC should have foreseen that its conduct would render them liable to suit here. This finding is not based merely on the product in question "find[ing] its way into [Texas]"—rather, it was TMC's "conduct and connection with [Texas]" that demonstrates such purposeful availment. *World-Wide Volkswagen*, 444 U.S. at 297; *see id.* at 296 (explaining that a product cannot serve as a defendant's "agent for service of process"). TMC placed the Class Vehicles in the stream of commerce, and, the product, while flowing down the commercial stream, ended up in Texas, the location of its American subsidiaries and the operational hub of TMC's American commercial endeavors. These contacts were not random, fortuitous, or attenuated*, Libersat v. Sundance Energy, Inc.*, 978 F.3d 315, 322 (5th Cir. 2020)—they were entirely foreseeable, and explain why TMC has, in this instance, purposefully availed itself of Texas as a forum.

### b. Relatedness

The Court looks next to whether Plaintiffs' causes of action arise out of or relate to TMC's contacts with Texas. A court may exercise specific jurisdiction over a nonresident defendant only when a "sufficient nexus" exists "between the [defendant]'s contacts with the forum and the cause of action." *Clemens v. McNamee*, 615 F.3d 374, 378–79 (5th Cir. 2010) (quoting *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 n.8 (1984)); *Dall. Texans Soccer Club v. Major League Soccer Players Union*, 247 F. Supp. 3d 784, 789 (E.D. Tex. 2017) ("Specific jurisdiction exists when the plaintiff alleges a cause of action that grows out of or relates to a contact between the defendant and the forum state."). At this juncture, the "central concern" of specific jurisdiction zooms into focus—"the relationship among the defendant, the forum, and the

litigation." *Shaffer v. Heitner*, 433 U.S. 186, 204 (1977); *see Dickson Marine Inc. v. Panalpina, Inc.*, 179 F.3d 331, 339 (5th Cir. 1999) (explaining that this requirement differentiates specific jurisdiction from general jurisdiction's "dispute[-]blind" nature). The connection between TMC's Texas-related contacts and the immediate action is pivotal because "it aims to give 'a degree of predictability to the legal system that allows potential defendants to structure their primary conduct with some minimum assurance as to where that conduct will and will not render them liable to suit.'" *Hyatt Int'l Corp. v. Coco*, 302 F.3d 707, 716 (7th Cir. 2002) (quoting *World-Wide Volkswagen*, 444 U.S. at 297); *see O'Connor v. Sandy Lane Hotel Co., Ltd.*, 496 F.3d 312, 322 (3d Cir. 2007) ("The animating principle behind th[is] . . . requirement is the notion of a tacit quid pro quo that makes litigation in the forum reasonably foreseeable.").

"Specific jurisdiction is 'a claim-specific inquiry,'" *Libersat*, 978 F.3d at 320 (quoting *Seiferth*, 472 F.3d at 274), and the relatedness prong is where this principle comes into play. TMC effectively advances two arguments as to why Plaintiffs claims do not arise out of or relate to its contacts with Texas: (1) the bases of the non-Texas plaintiffs' claims are the purchases of their respective Class Vehicles, which occurred outside of the forum state (Dkt. #49 at p. 12); and (2) the relatedness prong does not recognize Plaintiffs' claims as viable causes of action under the stream-of-commerce theory (Dkt. #49 at pp. 8, 10). The Court addresses each in turn.

First, the non-Texas plaintiffs. In this case, eighteen litigants hailing from eight different states come before the Court seeking relief (Dkt. #28 at pp. 13–30). They bring forty-six different causes of action against the four named defendants, including TMC[13] (Dkt. #28 at pp. 141–43,

---

[13] The only federal cause of action pleaded by any plaintiff is the claim alleging violation of the Magnuson–Moss Warranty Act ("MMWA") (Dkt. #28 at pp. 141–43). The *BMS* Court recognized that its decision "concern[ed] the due process limits on the exercise of specific jurisdiction by a State," which left open the question "whether the Fifth Amendment imposes the same restrictions on the exercise of personal jurisdiction by a federal court." 137 S. Ct. at 1783–84. Under current law, this Fifth Amendment inquiry is relevant to specific jurisdiction only when an action is "based upon a federal statute providing for nationwide service of process," *Busch v. Buchman, Buchman & O'Brien, Law Firm*, 11 F.3d 1255, 1258 (5th Cir. 1994), and when a plaintiff presents this type of claim, minimum contacts

153–234). And although the inquiry into personal jurisdiction is undoubtedly "defendant-focused," *Embry v. Hibbard Inshore, L.L.C.*, 803 F. App'x 746, 748–49 (5th Cir. 2020), the specific-jurisdiction variant emphasizes the actions of the party bringing suit, *Kulko v. Sup. Ct. of Cal.*, 436 U.S. 84, 92 (1978). As such, the Court must assess whether, as TMC questions, the non-Texas plaintiffs' claims arise out of or relate to TMC's contacts with Texas.

The Supreme Court addressed a similar situation in *Bristol-Myers Squibb*. There, 678 litigants filed eight individual actions in California against Bristol-Myers Squibb, a non-California corporation. *BMS*, 137 S. Ct. at 1777–78. Only eighty-six plaintiffs were Californians—the remaining 592 plaintiffs came from thirty-three different states. *Id.* at 1778. The non-California plaintiffs did not allege that their claims related to any actions Bristol-Myers Squibb had taken *in California*. *See id.* Bristol-Myers Squibb accordingly challenged the trial court's assertion of personal jurisdiction. *Id.*

The Supreme Court held that, per "[its] settled principles regarding specific jurisdiction," the California courts violated Bristol-Myers Squibb's due process rights by exerting jurisdiction over the company. *Id.* at 1781–82. Writing for the majority, Justice Alito reiterated that "to exercise specific jurisdiction over a claim, there must be an 'affiliation between the forum and the underlying controversy, principally, an activity or an occurrence that takes place in the forum State.'" *Id.* at 1781 (brackets omitted) (quoting *Goodyear*, 564 U.S. at 919). Absent such affiliation, "specific jurisdiction is lacking regardless of the extent of a defendant's unconnected activities in the State." *Id.* Applying these principles, the Supreme Court found specific

"with the United States (Fifth Amendment due process) suffice," while those "with a particular state (Fourteenth Amendment due process) are beside the point," *Double Eagle Energy Servs., L.L.C. v. MarkWest Utica EMG, L.L.C.*, 936 F.3d 260, 264 (5th Cir. 2019). *See, e.g.*, *Bellaire Gen. Hosp. v. Blue Cross Blue Shield of Mich.*, 97 F.3d 822, 825–26 (5th Cir. 1996) (ERISA). Because the MMWA does not authorize nationwide service of process, however, *Napoli-Bosse v. Gen. Motors LLC*, 453 F. Supp. 3d 536, 541 (D. Conn. 2020), the Court analyzes the MMWA claim, as it does with the state-law claims, under the Fourteenth Amendment.

jurisdiction over the non-California plaintiffs lacking for three primary reasons: (1) they were not residents of the forum state, (2) they did not suffer relevant harm in the forum state; and (3) all conduct giving rise to their claims occurred elsewhere. *Id.* at 1782.

In the immediate action, the activity of primary importance to the specific-jurisdiction analysis is the purchase of the Class Vehicles by Plaintiffs (*see* Dkt. #28 at pp. 11–30, 134). The non-Texas plaintiffs made these purchases outside of Texas (Dkt. #28 at pp. 13–20, 22–29). They also do not allege to have incurred the relevant injury in Texas (Dkt. #28 at pp. 13–30). These facts align with those from *BMS* that led the Supreme Court to find specific jurisdiction lacking. *See* 137 S. Ct. at 1782. And while, in contrast with *BMS*, some of TMC's relevant conduct detailed above took place in Texas, *supra* p. 13, the crux of the facts pertinent to the claims brought by the non-Texas litigants took place outside of Texas.[14] *See BMS*, 137 S. Ct. at 1782; *see also Walden*,

---

[14] The Court feels obligated to address the elephant in the room. TMC is intimately involved in the operations of its American subsidiaries and is extensively interwoven in the Toyota corporate family's process of taking United States-bound vehicles from the drawing board to dealerships across the country. *See, e.g.*, *Mead Data Cent., Inc. v. Toyota Motor Sales, U.S.A., Inc.*, 875 F.2d 1026, 1028 (2d Cir. 1989); *Simerlein v. Toyota Motor Corp.*, No. 3:17-CV-1091 (VAB), 2019 WL 2417404, at *3 (D. Conn. June 10, 2019); *Adams v. Toyota Motor Corp.*, No. CIV. 10-2802 ADM/JSM, 2015 WL 3742898, at *19 (D. Minn. June 15, 2015); *Sanyal v. Toyota Motor Corp.*, No. 1:14CV906 JCC/JFA, 2014 WL 4925842, at *2 (E.D. Va. Sept. 30, 2014); *In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices, & Prods. Liab. Litig.*, 826 F. Supp. 2d 1180, 1185 (C.D. Cal. 2011); *Est. of Miller v. Toyota Motor Corp.*, No. 607CV-1358ORL-19DAB, 2008 WL 516725, at *1 (M.D. Fla. Feb. 22, 2008). Like other foreign defendants, TMC structures its business as to "treat the United States as a single market rather than a state-specific market." William S. Dodge & Scott Dodson, *Personal Jurisdiction and Aliens*, 116 MICH. L. REV. 1205, 1224–25 (2018). Yet despite the base of its American operations firmly rooted in Texas and the vast activity of its expansive commercial network across the country, TMC's *nationwide* contacts are insufficient to confer the Court with personal jurisdiction over TMC. *See Patterson v. Aker Sols. Inc.*, 826 F.3d 231, 234–37 (5th Cir. 2016); *see also Frank v. P N K (Lake Charles) L.L.C.*, 947 F.3d 331, 336 (5th Cir. 2020). And, had Plaintiffs failed to show TMC's minimum contacts with Texas, the Court would have been without the power to adjudicate this case as to TMC. *Wade v. Miss. Co-op. Extension Serv.*, 528 F.2d 508, 519 (5th Cir. 1976); *see Hearing, supra*, 9:59:21–:44.

If, however, the Court had faced the question of whether "a federal court could exercise personal jurisdiction, consistent with the Fifth Amendment, based on an aggregation of the defendant's contacts with the Nation as a whole, rather than on its contacts with the State in which the federal court sits," the analysis might have been more concise and resolute. *Omni Cap. Int'l, Ltd. v. Rudolf Wolff & Co., Ltd.*, 484 U.S. 97, 102 n.5 (1987); *BMS*, 137 S. Ct. at 1783–84; *see* 4 CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 1068.1 (4th ed.). Although the Supreme Court has not directly addressed this concept, the Justices "ha[ve] repeatedly approved" of the notion of nationwide jurisdiction in dicta "[f]rom the early Republic to the present"—"even suggesting that it's 'not open to question.'" Stephen E. Sachs, *How Congress Should Fix Personal Jurisdiction*, 108 NW. U. L. REV. 1301, 1319–20 (2014) (quoting *Eastman Kodak Co. of N.Y. v. S. Photo Materials Co.*, 273 U.S. 359, 374 (1927)); *see Bellaire Gen. Hosp. v. Blue Cross Blue Shield of Mich.*, 97 F.3d 822, 825 (5th Cir. 1996). But unless the Fifth Circuit or the Supreme Court overrules the Fifth Circuit's decision in *Patterson*, the Court would remain bound by *Patterson*, and TMC

571 U.S. at 291 (finding "the mere fact that [the defendant's] conduct affected plaintiffs with connections to the forum State does not suffice to authorize jurisdiction"). Therefore, the Court does not find the non-Texas plaintiffs' claims to arise out of or relate to TMC's contacts with Texas.[15]

Now to the Texas plaintiffs. The essence of TMC's argument is that under the stream-of-commerce theory, the causes of action pleaded by the Texas plaintiffs are not the kind the Fifth Circuit recognizes as arising out of or relating to a defendant's contacts with the forum state (*see* Dkt. #49 at pp. 8, 10 & n.1). The stream-of-commerce principle has frequently been called upon in products-liability cases. *E.g.*, *Zoch*, 810 F. App'x at 289. But in addition, this theory may be considered in cases in which "the same public policy concerns that justify use of the stream-of-commerce principle in the products liability context are present." *Nuovo Pignone*, 310 F.3d at 381. As the Fifth Circuit makes clear, these "public policy concerns" are implicated "where a defendant places a product in the stream of commerce as part of a sales or distribution network designed to market its products nationwide (or at least outside of its home state) where it would derive financial benefit from sales in the forum." *Choice Healthcare*, 615 F.3d at 373. Since the case before the Court involves "a product sold or manufactured by a foreign defendant,"

---

would—for now—evade the Court's reach under this theory. *See Illinois v. Hemi Grp. LLC*, 622 F.3d 754, 760 (7th Cir. 2010) (characterizing the foreign defendant as "want[ing] to have its cake and eat it, too: it wants the benefit of a nationwide business model with none of the exposure."); *see also Douglass*, 996 F.3d at 302 ("This case presents a good vehicle for our *en banc* court to correct our course on Rule 4(k)(2) and apply Fifth Amendment due process precedent to cases where personal jurisdiction depends on satisfying Fifth Amendment due process requirements.").

[15] While the non-Texas plaintiffs may find this result less than satisfying, they are not out of options. For one thing, three defendants remain before the Court against whom these plaintiffs may still recover (*see* Dkt. #28 at pp. 30–34). As well, the non-Texas plaintiffs could probably bring these claims against TMC in the forums in which they each purchased the Class Vehicles. *See, e.g.*, *BMS*, 137 S. Ct. at 1783 ("Alternatively, the plaintiffs who are residents of a particular State—for example, the 92 plaintiffs from Texas and the 71 from Ohio—could probably sue together in their home States."); *see also World-Wide Volkswagen*, 444 U.S. at 293 ("[T]he States retain many essential attributes of sovereignty, including . . . the sovereign power to try causes in their courts. The sovereignty of each State . . . implie[s] a limitation on the sovereignty of all of its sister States . . . .").

the "'stream-of-commerce' approach to personal jurisdiction" is appropriate. *Ainsworth*, 716 F.3d at 177.

But not all causes of action satisfy the specific jurisdiction's relatedness prong under the stream-of-commerce theory. *See Alpine View*, 205 F.3d at 217. Generally speaking, "the Fifth Circuit considers the stream-of-commerce theory to be more applicable in tort than in contract." *LKQ Corp. v. Omega Lift Mfg., Inc.*, No. 4:09-CV-3122, 2010 WL 11590692, at *2 (S.D. Tex. Mar. 12, 2010); *see J.S.T. Corp.*, 965 F.3d at 576 (Barrett, J.) (explaining that "the point of consumer sale remains relevant to the relationship between the defendant, the forum, and the consumer-injury litigation" when a connection exists "between downstream consumer sales and [the plaintiff]'s underlying claims"). There are, of course, exceptions to this trend. *See, e.g.*, *Gulf Consol. Servs., Inc. v. Corinth Pipeworks, S.A.*, 898 F.2d 1071, 1073–74 (5th Cir. 1990). Normally, however, specific jurisdiction under the stream-of-commerce doctrine cannot be established as to a defendant in an action sounding in contract because the parties "have more flexibility to tailor their relationship in view of jurisdictional considerations." *Luv N' Care*, 438 F.3d at 472; *see Interstate Serv. Provider, Inc. v. Jordan*, No. 4:21-CV-267, 2021 WL 2355384, at *6 (E.D. Tex. June 9, 2021); *see also Nestlé USA, Inc. v. Doe*, 141 S. Ct. 1931, 1941 (2021) (Gorsuch, J., concurring) ("Causes of action in tort normally focus on wrongs and injuries, not who is responsible for them."). At day's end, the relatedness prong is met when the claims pleaded "aris[e] out of the product." *McFadin*, 587 F.3d at 762.

The Texas plaintiffs pleaded six separate causes of action (*see* Dkt. #28 at pp. 141–53). After reviewing these pleadings, the Court finds two of the claims to satisfy the applicable relatedness inquiry: Count II (violations of the Deceptive Trade Practices-Consumer Protection Act ("DTPA")) and Count V (fraud by concealment) (*see* Dkt. #28 at pp. 143–46, 150–52). Unlike

Counts I, III, IV, and VI, which are predicated on the contracts the Texas plaintiffs entered into upon purchasing the Class Vehicles, Counts II and V are founded on allegations that, prior to placing the relevant vehicles in the stream of commerce, TMC defectively designed or manufactured the Class Vehicles and did not disclose this information to the buyers in attempt to induce consumer purchases—which is conduct sounding in (intentional) tort (*see* Dkt. #28 at pp. 144–46, 151–52). *See J.E.M. Corp. v. McClellan*, 462 F. Supp. 1246, 1252 (D. Kan. 1978); *see also Performance Equip., LLC v. Morbark, Inc.*, No. CIV.A. 07-110-C, 2008 WL 5169397, at *5 (M.D. La. Dec. 9, 2008) (explaining that the stream-of-commerce theory applies to situations, like this one, in which a manufacturer consistently serves a forum's market, as opposed to those concerning "an isolated sale to a resident in another state"); *Spir Star AG v. Kimich*, 310 S.W.3d 868, 878 (Tex. 2010) (same). Moreover, Counts II and V are noncontractual causes of action stemming from TMC's placement of "a product in the stream of commerce as part of a sales or distribution network . . . where [TMC] would derive financial benefit from sales in [Texas]." *Choice Healthcare*, 615 F.3d at 373. Needless to say, "the same public policy concerns that justify use of the stream-of-commerce principle in the products liability context are present" as to Counts II and V. *Nuovo Pignone*, 310 F.3d at 381. Furthermore, courts have previously found these causes of action to arise out of or relate to a defendant's purposeful availment of a forum through the stream of commerce. *See, e.g.*, *Golf Doc LLC v. Teledyne Cont'l Motors Inc*, No. 4:16-CV-00579, 2016 WL 7451346, at *3 (E.D. Tex. Dec. 22, 2016) (DTPA); *Ruiz de Molina v. Merritt & Furman Ins. Agency, Inc.*, 207 F.3d 1351, 1357–58 (11th Cir. 2000) (fraud). Considering this

information cumulatively, the Court finds Counts II and V to arise out of or relate to TMC's contacts with Texas.

TMC briefly offers two additional arguments as to why the Court's conclusion is incorrect. First, TMC generally maintains that this case does not fit the mold of those in which courts have applied the stream-of-commerce approach (Dkt. #49 at pp. 8–11). In addition to the Court's already-stated reasoning to the contrary, TMC's argument is unsuccessful because this inquiry is case-specific, and applying the law to the facts at hand militates a different outcome than in the cases cited by TMC. *See Breathwit Marine Contractors, Ltd. v. Deloach Marine Servs., LLC*, 994 F. Supp. 2d 845, 850 (S.D. Tex. 2014) (Costa, J.).

Second, TMC argues that the relatedness prong has not been satisfied because Plaintiffs have not shown that, "'but for' TMC's forum-related conduct, the claims in question would not have arisen" (Dkt. #49 at p. 15). But this argument was recently addressed and soundly rejected by the Supreme Court. *See Ford Motor Co.*, 141 S. Ct. at 1026 (explaining that the Supreme Court has "never framed the specific jurisdiction inquiry as always requiring proof of causation—*i.e.*, proof that the plaintiff's claim came about because of the defendant's in-state conduct"). Writing for the Court, Justice Kagan clarified that while "the phrase 'relate to' incorporates real limits" as "to adequately protect defendants foreign to a forum," it also "contemplates that some relationships will support jurisdiction without a causal showing." *Id.* So, contrary to TMC's position, this "but-for" approach is not present in the relatedness prong's "requirement of a 'connection' between a plaintiff's suit and a defendant's activities." *Id.* (citing *BMS*, 137 S. Ct. at 1776).

In sum, after analyzing the relationship among TMC, this forum, and the causes of action Plaintiffs pleaded, the Court finds that two claims—those of the Texas plaintiffs for allegedly

violating the DTPA and committing fraud by concealment—arise out of or are related to TMC's contacts with Texas.

### III.    Fair Play and Substantial Justice

Since Plaintiffs have shown TMC to have minimum contacts with Texas in this litigation, TMC must now demonstrate that "asserting jurisdiction would offend traditional notions of fair play and substantial justice." *Hess v. Bumbo Int'l Tr.*, 954 F. Supp. 2d 590, 593 (S.D. Tex. 2013) (Costa, J). TMC "must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Burger King v. Rudzewicz*, 471 U.S. 462, 477 (1985); *see Wien*, 195 F.3d at 215 ("[O]nce minimum contacts are established, the interests of the forum and the plaintiff justify even large burdens on the defendant."). Furthermore, because it is highly uncommon for an assertion of jurisdiction to be unfair once minimum contacts have been established, the "fair play and substantial justice" factor should rarely be outcome determinative. *Blunt Wrap USA, Inc. v. Grabba-Leaf, L.L.C.*, No. CV 15-2764, 2016 WL 4547992, at *3 n.3 (E.D. La. Sept. 1, 2016) (Engelhardt, J.).

To determine whether it is unreasonable "to require [a] corporation to defend" itself in a specific forum, courts estimate "'the inconveniences' which would result to the corporation from a trial away from its 'home' or principal place of business." *Int'l Shoe*, 326 U.S. at 317 (quoting *Hutchinson v. Chase & Gilbert, Inc.*, 45 F.2d 139, 141 (2d Cir. 1930) (Hand, J.)). In making this assessment, courts "balance[]: '(1) the burden on the nonresident defendant, (2) the forum state's interests, (3) the plaintiff's interest in securing relief, (4) the interest of the interstate judicial system in the efficient administration of justice, and (5) the shared interest of the several states in furthering fundamental social policies.'" *E. Concrete Materials*, 948 F.3d at 298 (quoting *Luv N' Care*, 438 F.3d at 473). Additionally, when a foreign defendant is involved, "the procedural and

substantive policies of other nations whose interests are affected by the assertion of jurisdiction by the [forum state]" must be considered. *Asahi*, 480 U.S. at 115.

This inquiry, however, "does not operate in a vacuum"—decontextualizing fairness "and elevat[ing] it blindly over sovereign prerogatives" liberates a defendant "from the obligations inherent in a statist system." *Amusement Equip., Inc. v. Mordelt*, 779 F.2d 264, 270 (5th Cir. 1985). Thus, making a determination as to fair play and substantial justice "must result from a weighing of all the relevant facts" because the inquiry is "highly specific to each case and not susceptible of easy determination." *Burstein v. State Bar of Cal.*, 693 F.2d 511, 520 (5th Cir. 1982); *Kulko*, 436 U.S. at 92 ("[F]ew answers will be written 'in black and white. The greys are dominant and even among them the shades are innumerable.'" (quoting *Estin v. Estin*, 334 U.S. 541, 545 (1948))). Whether a foreign defendant's forum contacts comport with principles of due process "depend[s] on the nature of the litigation." *Submersible Sys., Inc. v. Perforadora Cent., S.A. de C.V.*, 249 F.3d 413, 419 (5th Cir. 2001).

In its briefing, TMC disputes only two of the relevant factors: considerations of international sovereignty and interests of the forum state. The Court takes each in turn.

To begin, TMC posits that concerns regarding the exercise of personal jurisdiction in the international field, as would be the case with a foreign defendant, "weigh heavily against imposing the burdens of U.S. litigation" on TMC[16] (Dkt. #39 at p. 24). This argument, while accurate in some respects, is neither entirely complete nor applicable. Without a doubt, "[t]he interests of foreign nations, 'as well as the Federal interest in Government's foreign relations policies, are best

---

[16] Plaintiffs also suggest that TMC will not be burdened by defending the immediate action because TMC has consented to the Court's jurisdiction in another pending case (Dkt. #45 at pp. 21–22). Plaintiffs' point, however, is flawed because, as TMC correctly puts it, "[a] litigant's choice to appear and not contest specific jurisdiction in a particular case is of no consequence in a separate and unrelated matter" (Dkt. #49 at p. 15; *see Hearing*, *supra*, 10:29:24–:37). *See also* FED. R. CIV. P. 12(h)(1).

served by a careful inquiry into the reasonableness of the assertion of jurisdiction in [a] particular case,'" *Johnston v. Multidata Sys. Int'l Corp.*, 523 F.3d 602, 615 (5th Cir. 2008) (original alteration omitted) (quoting *Asahi*, 480 U.S. at 115), and "courts should exercise 'great care and reserve when extending our notions of personal jurisdiction into the international field,'" *Williamson v. Petrol. Helicopters, Inc.*, 31 F. Supp. 2d 548, 553 (S.D. Tex. 1998) (ellipsis omitted) (quoting *Asahi*, 480 U.S. at 115). But observation of this principle does not—and cannot—permit the abdication of the Court's duty to exercise the judicial power. *See Earl v. Boeing Co.*, No. 4:19-CV-507, 2021 WL 274435, at *23 (E.D. Tex. Jan. 27, 2021). Furthermore, the international considerations which TMC calls upon to support its position are inconsequential here. *See, e.g.*, *Access Telecom, Inc. v. MCI Telecomms. Corp.*, 197 F.3d 694, 716 (5th Cir. 1999) ("For Telmex, a company that indisputably has engaged in numerous business dealings in the United States, these concerns are de minimis, and even if Mexican policy is relevant on the merits, it is not relevant to the initial determination of personal jurisdiction. If Telmex has broken U.S. law, then requiring Telmex to answer for that would be 'fair play.'"). As such, even if the Court (generously) construes this factor in TMC's favor, the considerations of international sovereignty are, at best, in equipoise.

Turning to the interests of the forum, TMC maintains that this factor weighs in its favor for two reasons, but neither is compelling. First, TMC argues that Texas "has no interest whatsoever in resolving claims by" the non-Texas plaintiffs (Dkt. #39 at p. 24). Given that the claims of the non-Texas plaintiffs do not arise from or relate to TMC's contacts with Texas, *supra* pp. 24–27, the Court does not consider this assertion here. Second, TMC states that whatever forum interests Texas may have in adjudicating the Texas plaintiffs' claims, such interests would be satisfied "by virtue of jurisdiction over the other Toyota Defendants" (Dkt. #39 at p. 24). This argument is

critically flawed. For one thing, the Court cannot locate, and TMC does not cite, any caselaw substantiating this proposition. Relatedly, the Court finds it peculiar that TMC would offer an argument so inconsistent with the rest of its pleadings. TMC spends quite some time in the Motion and its reply to emphasize (and reemphasize) that TMC is a wholly distinct entity from TMS, TMNA, and TEMA; but, all of a sudden, TMC contorts 180 degrees to argue that even if it has minimum contacts with Texas, the forum state's interests are assuaged by the presence of the other defendants. The Court finds this attempt at jurisdictional "whack-a-mole" unhelpful to TMC's position.

Moreover, even if TMC's arguments were viable, they are misplaced. This factor concerns a forum state's interest in adjudicating actions. And there can be no doubt Texas has several here, two of which are particularly prominent. For one, Texas has a strong interest in providing a forum for litigation when "a product," such as the Class Vehicles, "allegedly causes economic injury" within the state. *Luv N' Care*, 438 F.3d at 474; *Gulf Consol.*, 898 F.2d at 1074; *Petrol. Helicopters, Inc. v. Avco Corp.*, 804 F.2d 1367, 1371 (5th Cir. 1986). Even more broadly, Texas also has a general, "manifest interest in providing effective means of redress for its residents." *McGee v. Int'l Life Ins. Co.*, 355 U.S. 220, 223 (1957); *DeMelo v. Toche Marine, Inc.*, 711 F.2d 1260, 1272 (5th Cir. 1983); *Pedelahore v. Astropark, Inc.*, 745 F.2d 346, 349 (5th Cir. 1984). Therefore, despite TMC's contention, the interests-of-the-forum-state factor weighs against TMC.

Considering the relevant factors in light of the steep burden TMC faces here, the Court finds that TMC has not made out a compelling case that the Court's assertion of jurisdiction over it is unreasonable. *See, e.g.*, *Gold Kist*, 623 F.2d at 381–83. As such, it does not go against the

interests of fair play and substantial justice to allow Texas, a state with which TMC has sufficient minimum contacts, to exercise personal jurisdiction over TMC.

## IV. Pendent Personal Jurisdiction

Finally, even though the Court does not possess specific jurisdiction over Counts I, III–IV, and VI, pendent personal jurisdiction permits the Court to exercise jurisdiction over TMC as to these claims brought by the Texas plaintiffs. *E.g., EuroTec Vertical Flight Sols., LLC. v. Safran Helicopter Engines S.A.A.*, No. 3:15-CV-3454-S, 2019 WL 3503240, at *13–14 (N.D. Tex. Aug. 1, 2019); *see* 4A WRIGHT ET AL., *supra*, § 1069.7.

The doctrine of pendent personal jurisdiction enables a court with in personam jurisdiction over a defendant to exercise that jurisdiction over all transactionally related claims against the same defendant, even where the court lacks an independent basis for personal jurisdiction over one or more related claims. *Pension Advisory Grp., Ltd. v. Country Life Ins. Co.*, 771 F. Supp. 2d 680, 696 (S.D. Tex. 2011); *see United States v. Botefuhr*, 309 F.3d 1263, 1272 (10th Cir. 2002) ("[O]nce a district court has personal jurisdiction over a defendant for one claim, it may 'piggyback' onto that claim other claims over which it lacks independent personal jurisdiction, provided that all the claims arise from the same facts as the claim over which it has proper personal jurisdiction." (quoting *Anderson v. Century Prods. Co.*, 943 F. Supp. 137, 145 (D.N.H. 1996))). While the Fifth Circuit has not addressed pendent personal jurisdiction, sister courts have embraced the concept.[17] *See, e.g., Sedillo as Tr. of Filo & Fran Sedillo Revocable Tr. v. Team Techs., Inc.*, No. 3:20-CV-1628-D, 2020 WL 6870711, at *5 (N.D. Tex. Nov. 23, 2020); *ESPOT, Inc. v. MyVue Media, LLC*, 492 F. Supp. 3d 672, 700 (E.D. Tex. 2020); *Halcyon Biomedical, Inc. v. Glatt Air Techniques, Inc.*, No. CV H-19-690, 2019 WL 2420232, at *7 (S.D. Tex. June 10, 2019); *BidPrime, LLC v.*

---

[17] The Court has invoked pendent personal jurisdiction in a previous case. *See BioTE Med., LLC v. Jacobsen*, No. 4:18-CV-866, 2019 WL 5296979, at *3 (E.D. Tex. Aug. 22, 2019).

*SmartProcure, Inc.*, No. 1:18-CV-478-RP, 2018 WL 5260050, at *4 (W.D. Tex. Oct. 22, 2018); *see also Pension Advisory*, 771 F. Supp. 3d at 696 (collecting out-of-circuit caselaw, which "uniformly approve[s] pendent personal jurisdiction").

Courts conduct a three-part analysis to ensure the propriety of pendent personal jurisdiction. First, a court must identify an "anchor" claim, *i.e.*, a claim that allows a court to exercise personal jurisdiction over the defendant. *Gen. Elec. Capital Corp. v. Mackzilla, LLC*, No. CV H-15-2425, 2016 WL 1059529, at *5 (S.D. Tex. Mar. 17, 2016). Next, the court examines whether the anchor claim and the claim over which the court lacks an independent basis for personal jurisdiction "aris[e] out of the same nucleus of operative fact." *ESPOT*, 492 F. Supp. 3d at 700. If yes, then the court must determine whether entertaining the pendent claims against the defendant promotes "judicial economy, avoidance of piecemeal litigation[,] and the overall convenience of the parties." *Canyon Furniture Co. v. Rueda Sanchez*, No. SA-18-CV-00753-OLG, 2018 WL 6265041, at *13 (W.D. Tex. Nov. 8, 2018); *see In re Commonwealth Oil/Tesoro Petrol. Corp. Sec. Litig.*, 467 F. Supp. 227, 247 (W.D. Tex. 1979) (Higginbotham, J.). This final step—and, accordingly, the overall decision to invoke pendent personal jurisdiction—is "within the court's discretion." *Rolls-Royce Corp. v. Heros, Inc.*, 576 F. Supp. 2d 765, 784 (N.D. Tex. 2008); *see Martin v. La. & Ark. Ry. Co.*, 535 F.2d 892, 894 (5th Cir. 1976) ("[T]he mere existence of power to adjudicate pendent claims does not mean that the exercise of that power is wise in every instance.").

As stated above, *supra* pp. 27–30, the Court determined that two claims advanced by the Texas plaintiffs—Counts II and V—permit the Court to exercise personal jurisdiction over TMC. Having identified that either cause of action may serve as the anchor claim for purposes of pendent personal jurisdiction, the Court turns to the second analytical step and examines whether one of

these anchor claims and the claims over which the Court lacks an independent basis for personal jurisdiction—Counts I, III–IV, and VI—arise out of the same nucleus of operative fact. The "common nucleus of operative fact" concept is somewhat protean. *See Prolite Bldg. Supply, LLC v. MW Mfrs., Inc.*, 891 F.3d 256, 258 (7th Cir. 2018) (Easterbrook, J.). Nevertheless, claims have generally been found to derive from a common nucleus of operative fact when they are "so interrelated that plaintiffs 'would ordinarily be expected to try them all in one judicial proceeding.'" *Espino v. Besteiro*, 708 F.2d 1002, 1010 (5th Cir. 1983) (quoting *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 725 (1966)); *Mendoza v. Murphy*, 532 F.3d 342, 346 (5th Cir. 2008) (determining claims derive from a common nucleus of operative fact when they "concern the same core factual issue"); *see Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 553 (2005). More concretely, courts tend to characterize claims derived from a common nucleus of operative fact as those "arising out of the same 'occurrence.'" *FDIC v. C.D. Henderson Inc.*, No. A-07-CA-982-SS, 2008 WL 11334958 (W.D. Tex. Oct. 31, 2008); *Mortell v. Mortell Co.*, 887 F.2d 1322, 1325 (7th Cir. 1989) (Easterbrook, J.) ("One series of related transactions is a single 'nucleus of operative facts.' All theories of liability concerning the same transaction or series of acts should be litigated in the same suit . . . .").

An examination of the relevant facts shows that Counts I, III–IV, and VI derive from the same nucleus of operative fact as the anchor claims. *See, e.g.*, *Harrison v. Tex. Dep't of Corr.*, 694 F. Supp. 226, 228 (E.D. Tex. 1988). These claims are grounded in the same series of actions—the manufacturing and sale of Class Vehicles to the Texas plaintiffs without disclosing the alleged defect. There can be little doubt that the anchor claims and the claims over which the Court lacks an independent basis of personal jurisdiction share the "loose factual connection" characteristic of

a common nucleus of operative fact. 13 CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 3523 (3d ed.).

Consequently, the Court turns to the final analytical step and looks to whether judicial economy, the avoidance of piecemeal litigation, and the overall convenience of the parties would be served by the exercise of pendent personal jurisdiction against TMC. *Action Embroidery Corp. v. Atl. Embroidery, Inc.*, 368 F.3d 1174, 1181 (9th Cir. 2004). The Court finds that keeping the pendent claims together with the anchor claims will promote these interests for two key reasons. First, TMC is already present in this action and must remain before the Court as a defendant to Counts II and V. Therefore, the burden on TMC to defend against the pendent claims is minimal.[18] *ESAB Grp., Inc. v. Centricut, Inc.*, 126 F.3d 617, 628 (4th Cir. 1997); *see Wultz v. Islamic Republic of Iran*, 755 F. Supp. 2d 1, 36 (D.D.C. 2010). Second, were the Court to decline to exercise pendent personal jurisdiction over Counts I, III–IV, and VI, TMC might be forced to litigate these causes of action, which share a common nucleus of operative fact with the anchor claims, in a cross-jurisdictional, piecemeal fashion. Allowing such an outcome would run contrary to the justifications elemental to the doctrine of pendent personal jurisdiction. *Capitol Specialty Ins. Corp. v. Splash Dogs, LLC*, 801 F. Supp. 2d 657, 667 (S.D. Ohio 2011). Taken together, considerations of judicial economy, avoidance of piecemeal litigation, and overall convenience of the parties counsel the Court to wield its discretion and exercise pendent personal jurisdiction in this case.

At a fundamental level, pendent jurisdiction is simply "a doctrine of flexibility, designed to allow courts to deal with cases involving pendent claims in the manner that most sensibly

---

[18] If new developments occur that shift the tides of equity in TMC's favor, the Court retains the authority to dismiss any and all pendent claims "if that seems the fairer course." *Robinson v. Penn Cent. Co.*, 484 F.2d 553, 556 (3d Cir. 1973).

accommodates a range of concerns and values." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988); *Mobil Oil Corp. v. Kelley*, 493 F.2d 784, 788 (5th Cir. 1974). Because the facts at issue satisfy the tripartite requirements of pendent personal jurisdiction, the doctrinal breathing room accompanying this form of pendent jurisdiction will allow for the most efficient and effective resolution of the claims brought by the Texas plaintiffs against TMC. *Brunswick v. Regent*, 463 F.2d 1205, 1207 (5th Cir. 1972) (per curiam). As such, the Court concludes that it is within its right to exercise pendent personal jurisdiction over Counts I, III–IV, and VI, thereby allowing litigation in the current case as to all causes of action brought by the Texas plaintiffs.

*   *   *

At this stage of the proceedings, Plaintiffs needed to make out a prima facie case supporting jurisdiction over TMC. From the Court's perspective, Plaintiffs have satisfied this personal-jurisdiction standard by "present[ing] enough evidence to withstand a motion for judgment as a matter of law." *AcryliCon USA, LLC v. Silikal GmbH*, 985 F.3d 1350, 1364 (11th Cir. 2021). In light of the foregoing analysis, the Court finds Plaintiffs to have demonstrated the Court's jurisdiction over TMC.

## CONCLUSION

It is therefore **ORDERED** that Defendant's Motion to Dismiss Pursuant to F.R.C.P. Rule 12(b)(2) (Dkt. #39) is **GRANTED in part**, and the non-Texas plaintiffs' claims against TMC are hereby **DISMISSED without prejudice**.

It is **FURTHER ORDERED** that the Motion is **DENIED in part**, and the Texas plaintiffs' claims against TMC remain before the Court. This Order in no way affects the Court's jurisdiction over TMS, TMNA, or TEMA.

**IT IS SO ORDERED.**

**SIGNED** this 6th day of July, 2021.

AMOS L. MAZZANT
UNITED STATES DISTRICT JUDGE